*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0145P (6th Cir.)
File Name: 00a0145p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

| | | |
|---|---|---|
| A. CARL HELWIG, on Behalf of Himself and All Others Similarly Situated; GARY BARNES; MEREDITH WILSON BROWN; ROBERT BROWN; S. KAY LUTES; SYBIL R. MEISEL; BARBARA E. SHUSTER, *Plaintiffs-Appellants,* *v.* VENCOR, INC.; W. BRUCE LUNSFORD; W. EARL REED, III; MICHAEL R. BARR; THOMAS T. LADT; JILL L. FORCE; JAMES H. GILLENWATER, JR., *Defendants-Appellees.* | | No. 99-5153 |

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 97-00835—Charles R. Simpson, III, Chief District
Judge.

Argued: December 15, 1999

1

Decided and Filed:  April 24, 2000

Before:  MERRITT, KENNEDY, and SILER, Circuit
Judges.

_____

**COUNSEL**

**ARGUED:**  Arthur R. Miller, HARVARD LAW SCHOOL,
Cambridge, Massachusetts, for Appellants.  Gregory P.
Joseph, FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON, New York, New York, for Appellees.
**ON BRIEF:**  Kenneth J. Vianale, MILBERG, WEISS,
BERSHAD, HYNES & LERACH, Boca Raton, Florida, for
Appellants.  Gregory P. Joseph, Kirsa Phillips, Rachel S.
Fleishman, FRIED, FRANK, HARRIS, SHRIVER &
JACOBSON, New York, New York, David B. Tachau,
TACHAU, MADDOX, HOVIOUS & DICKENS, Louisville,
Kentucky, for Appellees.

   KENNEDY, J., delivered the opinion of the court, in which
SILER, J., joined.  MERRITT, J. (pp. 22-26), delivered a
separate dissenting opinion.

_____

**OPINION**
_____

   KENNEDY, Circuit Judge.  Plaintiffs, A. Carl Helwig, et
al., on behalf of themselves and others similarly situated,
appeal the decision of the district court granting summary
judgment in favor of the defendants, Vencor, Inc., et al., in
this securities fraud action.  Plaintiffs contend that the district
court erred in converting defendants' motion to dismiss into
a motion for summary judgment without providing the
plaintiffs with sufficient notice to defend against a summary
judgment motion.  Defendants argue that this court can affirm
the district court's opinion on summary judgment grounds or
on the grounds that the plaintiffs have failed to state a claim

947 F.2d 841, 848 (7th Cir. 1991). Applying *Rubin* to this case, when defendants chose to speak they have a duty to provide complete and non-misleading information regarding those statements. Defendants failed to do so. Accordingly, I would reverse the judgment of the district court, deny defendants' motion to dismiss, and remand to the district court for further proceedings.

The narrow, rigid interpretation our Court has given the Private Securities Litigation Reform Act makes it now almost impossible to allege securities fraud successfully. The effect of the Court's decision seems to be that no statements about the future prospects ("forward-looking" statements) of a company are actionable, no matter how dishonest as long as they are accompanied by "magic words" disclaiming knowledge. It makes no difference that insiders are selling their stock with secret knowledge that the company's prospects are bad while saying the opposite to the public. It reminds me of the rigidity with which the common law courts came to interpret the old forms of action in the seventeenth century. Our system of equity or code or notice pleading is supposed to have changed all that once and for all, but our Court has returned to it with a vengeance in this case under the Private Securities Litigation Reform Act.

upon which relief can be granted. While we agree with the plaintiffs that the district court could not convert the defendants' motion to dismiss to a motion for summary judgment without notice, we also agree with the defendants and affirm the district court's dismissal of the action on the grounds that the plaintiffs have failed to state a claim upon which relief can be granted.

## I. Facts[1]

Vencor, which is located in Louisville, Kentucky, is a provider of managed health care services, including long-term hospitals and nursing homes. On October 22, 1997, prior to the opening of the stock market, Vencor announced its earnings results for the third quarter of 1997 and issued a statement indicating that its expected fourth quarter earnings would be lower than previously forecast. Vencor stated that rather than the $0.59-$0.64 earnings per share that it had forecast, earnings for the fourth quarter of 1997 were expected to be in the range of $0.40-$0.45 per share. Vencor explained that the change in projected earnings was due to the adverse effect of the Balanced Budget Act on Vencor's operations. In response to this announcement, the price of Vencor's stock fell from a per share price of $42-5/8 on October 21, 1997 to a per share price of $30 on October 22, 1997. Soon after this development, Vencor announced that its anticipated sale of one of its divisions would not be consummated due to the buyer's unwillingness to purchase the division for cash. This announcement resulted in a further drop in the price of Vencor's stock to a level of $23 per share.

---

[1] These facts are either alleged by the plaintiffs or found in the documents filed with the defendants' motion to dismiss. We are required to accept the plaintiffs' allegations as true in ruling on a motion to dismiss. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). We also are permitted to consider those facts contained in documents referred to in the plaintiffs' complaint and central to the plaintiffs' claim in ruling on a motion to dismiss. *See Greenberg v. The Life Insurance Company of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999); *see also infra* note 13.

At the time plaintiffs filed this action, Vencor stock was trading at less than $25 per share.

On December 24, 1997, plaintiffs filed this class action against Vencor[2] and six of its directors alleging that the defendants had proffered false and misleading statements, from February 10, 1997 until October 21, 1997, in violation of Section 10(b) of the Securities Exchange Act of 1934.[3] Plaintiffs also alleged a violation of Section 20(a) of the Securities Exchange Act of 1934[4] against each of the individual defendants.[5]    Plaintiffs' complaint sets forth

---

[2]On May 1, 1998, Vencor reorganized into two public companies, Vencor and Ventas.  On July 27, 1998, plaintiffs filed an amended complaint against the original defendants as well as Ventas.

[3]Section 10(b) provides:
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
—
(b)  To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b) (West 1997).

[4]Section 20(a) provides:
Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C § 78t(a) (West 1997).

[5]Vencor, Inc. filed a voluntary petition for Chapter 11 bankruptcy on September 13, 1999.  Pursuant to section 362 of the Bankruptcy Code, this proceeding against Vencor, Inc. has been stayed by the bankruptcy

---

forward looking statement, then there is no liability as a matter of law. *See* 15 U.S.C. § 78u-5(c)(1)(B).  Second, even if actual knowledge of falsity is factually pled, the statutory safe harbors bars liability of the forward looking statement if the statement is accompanied by a cautionary statement about its uncertainty. *See* 15 U.S.C. § 78u-5(c)(1)(A).  With this in mind, I would find that the "cautionary statement" proffered by defendants does not meet the criteria set by the statute. Nowhere in Vencor's 1997 public disclosures or statements prior to October 22 ,1997, does Vencor identify important factors or specifically warn of any *negative* impact by the proposed Medicare legislation.  Defendants simply continued to warn that management could not predict whether such proposals would be adopted or if adopted, what effect, *if any*, such proposals would have on its business.  In point of fact, defendants knew that the Medicare legislation was likely to have a serious adverse effect and should have said so.

Defendants should not be allowed to make exaggerated earnings projections and then abstractly warn of pending legislation in Congress claiming that they say they have no idea how it will affect revenues, while at the same time telling employees whom they are laying off that "tough times" are ahead because of certain pending Medicare legislation.

This would not be the first time that this circuit has held that a defendant could be held liable to investors for failing to disclose certain material information in connection with a stock investment. In *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263 (6th Cir. 1998), we held, en banc, in an opinion from which Judge Kennedy dissented, that an attorney could be held liable because he had chosen to speak to investors about material details of their proposed securities investment with the issuer without revealing certain additional facts necessary to make his statement not misleading.  *See Rubin*, 143 F.3d at 267-68.  We reasoned that even when a person is not under an independent duty to provide information, a person "assumes a duty to provide complete and non-misleading information with respect to subjects on which he undertakes to speak."  *Id.* at 268 (citing *Ackerman v. Schartz*,

company, defendants Bruce Lunsford, chairman of the board, CEO, and president of Vencor, and Earl Reed, executive vice president and CFO, continued to publicly predict rosy earnings estimates of $2.10 and $2.60 per share for 1997 and 1998 respectively. Am. Compl. ¶ 100. It is ludicrous to think that by this time Vencor management had no knowledge of negative implications the Act would have on the future of Medicare and Medicaid reimbursements. I think that plaintiffs' allegations are sufficient to allow them their day in court.

The law in this area is clear. Rule 10b-5, promulgated under Section 10(b), states in relevant part: "It shall be unlawful for any person... to make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. Plaintiffs allege that defendants did exactly what Rule 10b-5 forbids. To escape any liability, defendants and the panel majority hold that their statements regarding Vencor's earnings were "forward-looking" statements and included sufficient cautionary language as to the uncertainty of those projections, thus triggering the safe harbor provision of the Private Securities Litigation Reform Act. 15 U.S.C. § 78u-5(c). This is wrong.

A forward-looking statement is defined, among other things, as a statement including a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure, or other financial terms. *See* 15 U.S.C. § 78u-5(i)(1)(A). A company is allowed to make a forward-looking statement without fear of liability if the statement does not hold true when the statement is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1). This is the so-called safe harbor provision. The statutory safe harbor operates in the alternative in two steps. First, unless a complaint pleads specific facts demonstrating that defendants have actual knowledge of the falsity of the

numerous allegations of false and misleading statements made by the defendants either directly to the public or to the public through financial analysts. These allegedly false and misleading statements can be classified as falling into one of the following categories: 1) statements relating to the effect of the Balanced Budget Act on Vencor's earnings; 2) statements relating to Vencor's acquisition of TheraTx and Transitional; and 3) statements relating to the proposed sale of one of Vencor's divisions, Behavioral Healthcare ("BHC"), to Charter Behavioral Health Systems. Plaintiffs' remaining allegations concern the individual defendants' sale of personal stock.

On February 6, 1997, President Clinton proposed the Balanced Budget Act. This legislation included numerous revisions to the Medicare reimbursement laws.[6] At the time

---

court. The remaining defendants include Ventas, Inc., and the following individuals: W. Bruce Lunsford, President and CEO of Vencor, Inc., W. Earl Reed, III, Executive Vice-President and CFO of Vencor, Inc., Michael R. Barr, Executive Vice-President, COO and Director of Vencor, Inc., Thomas T. Ladt, Executive Vice-President of Vencor, Inc., Jill L. Force, Senior Vice-President, Secretary and General Counsel of Vencor, Inc, and James H. Gillenwater, Jr., Senior Vice-President of Vencor, Inc.

[6] There were four provisions in the Administration's proposal that the plaintiffs allege would have a negative impact on Vencor's business. These were:

a) The Administration's proposal eliminated all incentive payments made to hospitals that kept their actual costs below their TEFRA target, the amount computed pursuant to the Tax Equity and Fiscal Responsibility Act of 1982.

b) The Administration proposed reductions, beginning in 1998 at the amount of 1.5% below the market basket index, of Medicare payments to PPS-exempt hospitals such as those owned by Vencor. Generally, Medicare reimbursements are based on a fixed payment per patient basis ("PPS"). PPS-exempt hospitals are entitled to reimbursement on an actual cost basis linked to the TEFRA target.

c) The Administration proposed caps on increases in TEFRA target amounts based on the average cost per patient for all long-term care hospitals.

d) The Administration's proposal denied all new long-term care

plaintiffs initiated this lawsuit, Vencor was the nation's largest operator of long-term hospitals and the second largest operator of nursing homes. Medicare reimbursement made up a significant portion of Vencor's revenue. Prior to the proposal of this specific legislation, the President had initiated a number of unsuccessful attempts to institute Medicare reform. The Balanced Budget Act was signed into law on August 5, 1997. During the six months that the legislation was before Congress, changes were made to the Administration's proposal and the enacted legislation differed in many ways from the proposed legislation.[7]

While this proposed legislation was being debated in Congress, Vencor received reports on the progress of the legislation from its lobbyists in Washington, D.C. In late April and early May, Thomas Schumann, Vice-President and Director of Vencor's Reimbursement Department, directed his employees to prepare detailed cost analyses of the Balanced Budget Act. Although some of these analyses focused on the effects the Act would have on specific departments of Vencor, defendant Reed and Richard Lechleiter, Vice-President for Finance and Corporate Controller, directed that analyses be done studying all possible effects of the Act on Vencor's revenues and earnings. At the end of July, around the time that the Act was passed, Vencor issued an internal memorandum setting forth the impact of the new legislation on its finances.

---

hospitals any exemption from Medicare PPS.

[7]Of the four provisions of the Administration's proposal only two were enacted. The enacted legislation included the following provisions:
  a) The legislation retained incentive payments for hospitals that keep their actual costs below TEFRA targets, setting them at the lesser of either: (1) 15% of the difference between the TEFRA target and operating costs, or (2) 2% of the TEFRA target.
  b) The legislation reduced Medicare payments to PPS-exempt hospitals at the rate of 0% in 1998 and according to a sliding scale based on a comparison of the hospital's actual costs to its target for 1999-2002.
  c) The legislation capped TEFRA limits at 75%.

officer, and James Gillenwater, senior vice president of the company, gave a presentation to approximately one hundred Transitional employees. At that meeting, Barr gave Transitional employees notice that they would be laid off in sixty days. Barr went on to tell the employees that there were "tough times coming in the industry because of likely cutbacks in Medicare" and that "they would have been laid off anyway because the proposed Medicare regulations were going to make it difficult for Vencor to make money and stay profitable." Am. Compl. ¶ 72.

A month later, on July 25, 1997, Vencor filed its second quarter 10-Q with the SEC. Even though defendants had just told employees they were laying off that "tough times" were ahead and that it would be difficult to stay profitable, in their report to the SEC, defendants continued to indicate that Vencor's business would not be adversely affected by any pending legislation. Amazingly, defendants made these "predictions" even after the Balanced Budget Act had already passed both the House and the Senate a full month earlier and when it was certain the proposals would be implemented. In their second quarter 10-Q, defendants did issue a general warning that Congress was considering various proposals that could reduce expenditures under certain governmental health and welfare programs such as Medicare and Medicaid, but unequivocally stated that it could not predict the impact of this legislation. As plaintiffs allege, defendants went on to selectively warn of proposed Health Care Financing Administration regulations, but made absolutely no specific mention of the passage or impact of the Balanced Budget Act. Plaintiffs assert that Vencor's 1997 second quarter 10-Q was misleading as to the negative impact caused by the passage of the Balanced Budget Act.

Moreover, even after the Balanced Budget Act had been signed into law on August 5, 1997, plaintiffs allege that defendants continued to issue the same earnings forecasts to the marketplace as they had earlier. On September 25, 1997, seven weeks after the Act was signed into law and six months after Vencor began analyzing the Act's effect on the

_____

**DISSENT**

_____

MERRITT, Circuit Judge, dissenting. The plaintiffs satisfy the pleading requirements of Rule 9(b) and 15 U.S.C., the new Private Securities Litigation Act, § 74u-4(b)(1) and (2). In their seventy-four page complaint, plaintiffs allege with sufficient specificity (1) statements the defendants made during the April - October 1997 class period to the investing public and to financial analysts that the Balanced Budget Act would have no adverse impact on Vencor's future earnings (2) when they well knew that the Act would have a serious negative effect on earnings.

In cases of securities fraud, plaintiffs need only plead one material misrepresentation or omission in order for this court to sustain the complaint. *See In re Fidelity/Micron Sec. Litig.*, 964 F. Supp. 539, 543 (D. Mass. 1997). In reviewing the plaintiffs' complaint and alleged misrepresentations concerning the Balanced Budget Act, the court errs in its treatment of so called "forward-looking" statements by the defendants. The panel majority found that all of the statements alleged by the plaintiffs relating to the effect of the Act on the earnings and revenues of Vencor made before the legislation was signed into law were entitled to safe harbor protection as "forward-looking" statements. This is an untenable position because it lets the defendants get away with talking out of both sides of their mouths saying "yes" to the investing public and "no" to their own employees.

Plaintiffs plead that defendants knowingly made false and misleading statements as to expected earnings and revenues of Vencor. As evidence of defendants' knowledge, they allege in their complaint that in June 1997, Vencor was aware of the probable negative ramifications that the Balanced Budget Act's Medicare reforms would have on the company. Specifically, plaintiffs state that in late June 1997, after acquiring Transitional Hospitals Corporation, defendants Michael Barr, executive vice president and chief operating

Over the six months that the Balanced Budget Act was before Congress, Vencor issued numerous statements about its financial health. From February 10, 1997 until its announcement on October 22, 1997 of revised earnings projections, Vencor stated that it was "comfortable" with a Fourth Quarter earnings projection of $0.59-$0.64 earnings per share and a yearly earnings projection of between $2.15 and $2.20 for 1997 and $2.60 and $2.65 for 1998. Vencor's positive statements about its earning potential led numerous financial analysts to recommend Vencor's stock as a "buy." Vencor, however, did note that

> the Company cannot predict the content of any healthcare or budget reform legislation which may be proposed in Congress or in state legislatures in the future, and whether such legislation, if any, will be adopted. Accordingly, the Company is unable to assess the effect of any such legislation on its business. There can be no assurance that any such legislation will not have a material adverse impact on the Company's future growth, revenues and income.[8]

On February 10, 1997, Vencor announced its acquisition of TheraTx. The press release relaying this information stated that "[t]he inclusion of TheraTx is expected to be accretive to earnings based on projected synergies." At the time of this acquisition, TheraTx was carrying approximately $25 million of bad debt from patients who could not pay their bills. On July 24, 1997, Vencor announced its Second Quarter earnings and defendant Lunsford stated that Vencor had "successfully integrated the operations of TheraTx." TheraTx's existing computer system, however, was not fully operational until March of 1998 due to the need to teach Vencor employees how to use the system.

_____

[8]This language was found in Vencor's 1996 Form 10-K filed on March 27, 1997. Similar warnings can be found in Vencor's First and Second Quarter 10-Q.

On June 20, 1997, Vencor acquired Transitional Hospitals Corporation, giving Vencor control over 58 of the estimated 109 long-term acute care hospitals in the U.S. In connection with this acquisition, Vencor announced on June 27, 1997, a $500 million senior subordinated debt private placement. On or about July 15, 1997, Vencor announced that it had sold $750 million of senior notes, scheduled to mature in July of 2007. On October 8, 1997, Vencor initiated an offer to exchange the senior subordinated notes, issued in July 1997 in the private placement, for publicly registered notes having identical terms and conditions. The old notes issued in the private placement provided that if a registration statement was not filed by September 19, 1997, declared effective by November 18, 1997, or consummated or not declared a shelf registration statement effective by December 18, 1997, then Vencor would have to pay additional interest on the old notes.

On September 16, 1997, Vencor announced a definitive agreement to sell Behavioral Healthcare Corporation, a division of Transitional, to a subsidiary of Charter Behavioral Health Systems. The press release accompanying this announcement stated that "[t]his transaction, which is subject to acceptable financing, due diligence by CBHS and certain regulatory approvals, is expected to close during the fourth quarter of 1997." On November 3, 1997, Vencor announced that it would not be selling BHC due to a failure to agree to final payment terms.

During the Class Period, the individual defendants sold portions of their stock holdings in Vencor. Between July and September, Vencor's officers and directors sold more than 222,000 shares for proceeds of approximately $9.5 million. During the month of July, defendant Lunsford sold 50,000 shares realizing proceeds of over $2,137,500, defendant Barr sold 52,500 shares realizing proceeds of over $2,232,500, defendant Ladt sold 12,000 shares realizing proceeds of over $500,000, and defendant Gillenwater sold 4,100 shares realizing proceeds of over $174,000. On September 18, 1997, defendant Force sold 17,812 shares realizing proceeds of over $789,000. Between September 18, 1997 and September 19,

attributing inside information to the defendants concern the internal memorandum discussing the potential effects of the Balanced Budget Act. The individual defendants, like the corporation, did not know whether the Balanced Budget Act would be passed; thus, they cannot be held liable for actions alleged to be taken in reliance on the passage of the Balanced Budget Act. Because the plaintiffs do not allege that the individual defendants had inside information stating that the Balanced Budget Act would pass they fail to state a claim against the individual defendants who sold their stock prior to the passage of the legislation.[15] In addition, the internal memorandum upon which the plaintiffs rely states that further study is needed to make an accurate assessment of the effects of the Act on the corporation. We do not believe that this memorandum provided those defendants who sold their stock after the passage of the Act with inside information.[16] While plaintiffs' allegations may establish motive and opportunity, they are insufficient to demonstrate a strong inference of the individual defendant's use of inside information deceptively.

### III. Conclusion

For the foregoing reasons, we find that the plaintiffs' complaint does not contain sufficient factual allegations to state a claim under the PSLRA and should be dismissed.

---

[15]Plaintiffs allege that defendants Lunsford, Barr, Ladt and Gillenwater sold stock prior to the enactment of the Balanced Budget Act.

[16]Plaintiffs allege that defendants Force and Reed sold stock after the Balanced Budget Act was enacted.

### 3. *Proposed Sale of BHC*

Plaintiffs allege that defendants made false and misleading statements in their announcement of the anticipated sale of BHC to Charter. Plaintiffs contend that defendants made these statements in an attempt to bolster the price of Vencor stock and to prime the market for its sale of $750 million in senior notes. In announcing the "definitive agreement" between Vencor and Charter, defendants stated that Charter was to pay $140 million in cash for BHC. Plaintiffs state that this announcement of a cash sale was designed to alleviate concerns about the substantial debt Vencor had incurred in its acquisition of Transitional. On November 3, 1997, Vencor announced that the sale would not be made because of a failure to agree to payment terms.

Plaintiffs' allegations that Vencor's statements about the sale were false and misleading is incorrect. Clearly stated in Vencor's announcement is that the sale is conditional: "This transaction, *which is subject to acceptable financing, due diligence by CBHS and certain regulatory approvals,* is expected to close during the fourth quarter." This alleged statement which, on its face, is not false does not support plaintiffs' claim of fraud. Because Vencor never stated that the sale had been consummated we find that the statements associated with this announcement are not false and misleading.

### 4. *"Controlling Person" Liability and Insider Trading*

The plaintiffs bring claims against the individual defendants both as "controlling persons" of the corporation and as individual insider traders. Because plaintiffs fail to state a claim against the corporation they also fail to state a claim against the individual defendants as "controlling persons." *See Comshare*, 183 F.3d at 554 n.11. In order for plaintiffs' claim of insider trading to stand against the individual defendants, plaintiffs must allege that the defendants had knowledge of non-public information that they utilized in a manipulative and deceptive manner. *See* 15 U.S.C. § 78j(b) (West 1997). Plaintiffs' only allegations

---

1997, defendant Reed sold 69,400 shares realizing proceeds of over $3,030,580.[9]

In their complaint, plaintiffs allege that the defendants made false and misleading statements in relation to Vencor's financial activities from February 10, 1997 until October 21, 1997. Plaintiffs contend that these statements were made in an attempt to elevate the price of Vencor stock. During the Class Period, the stock price rose from a per share price of $31 to a high of over $44 per share. After Vencor's announcement of lower than expected Fourth Quarter earnings on October 22, 1997, the stock price fell from $42-5/8 to $30 per share.

Plaintiffs filed this action in district court on December 24, 1997. On September 10, 1998, defendants filed a motion to dismiss the complaint pursuant to Fed. R .Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C §§ 78u-4 & -5. The district court judge sua sponte converted the motion to dismiss into a motion for summary judgment. Ruling in favor of the defendants, the district court dismissed plaintiffs' complaint with prejudice. Plaintiffs filed a timely appeal.

## II. Discussion

On appeal, plaintiffs argue that the district court erred in converting the defendants' motion to dismiss into a summary judgment motion without giving the plaintiffs sufficient notice to prepare a defense to a summary judgment motion. We agree with the plaintiffs that the district court did err. Rule 12(b) provides that

[i]f, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon

---

[9]Plaintiffs allege that, on September 25, 1997, Bear Sterns issued a report on Vencor which included an explanation for Reed's sale of stock. The report stated that Reed sold the stock to retire a $2 million personal loan that Reed had obtained to exercise stock options.

which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b) (West 2000). Plaintiffs only learned of the district court's decision to convert the motion to dismiss to a motion for summary judgment upon receiving the district court's opinion dismissing the plaintiffs' complaint with prejudice. Although the district court stated that it was deciding a motion for summary judgment, the documents which it relied upon were, for the most part, documents "referred to in the complaint" and "central to the plaintiffs' claim." Defendants submitted authentic copies of these documents in their entirety to the court. The court's consideration of these documents did not require the conversion of the motion to dismiss into one for summary judgment. *See Greenberg*, 177 F.3d at 514 (holding that when a document is referred to in the plaintiff's complaint and is central to the plaintiff's claim the court may consider the document in ruling on a motion to dismiss). The reasons given by the district court for granting summary judgment were based, in most instances, on plaintiffs' allegations, these documents, judicial notice[10] and legal analysis which would support a decision to dismiss a plaintiff's complaint for failure to state a claim upon which relief can be granted.

---

[10]In reaching the conclusion that the plaintiffs have failed to state a claim upon which relief can be granted, we have considered not only those documents referenced in the plaintiffs' complaint, but also documents filed with the SEC. We believe that it is appropriate to take judicial notice of public documents and that our consideration of these documents does not require conversion of defendants' motion to dismiss to a motion for summary judgment. *See Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (holding that the district court did not err in taking judicial notice of public documents when considering a motion to dismiss).

plaintiffs have not established a strong inference that this statement was false or misleading.

Plaintiffs allege that defendants' statements about the acquisition of Transitional were false and misleading. Plaintiffs, however, do not allege any statements with regard to this transaction which cannot be classified as forward-looking statements about "soft" information. Plaintiffs allege that on or about the last week in June of 1997, defendant Barr gave Transitional employees notice that they would be laid off in sixty days and told these employees that they probably would have been laid off anyway due to the proposed Medicare regulations. The plaintiffs proffer this statement as evidence of defendant Barr's knowledge of the effect of the Balanced Budget Act on Vencor's operations. Plaintiffs, however, fail to connect this statement to any of their allegations concerning the defendants' false and misleading statements. Without alleging a link between this statement and defendants' allegedly false and misleading statements, the plaintiffs have failed to allege sufficient facts establishing a strong inference of scienter. On its own, this statement is not actionable because it constitutes defendant Barr's opinion and is "soft" information. In the plaintiffs' other allegations involving the Transitional acquisition, they contend that the defendants made false and misleading statements about the benefit of the Transitional acquisition because they knew that the Balanced Budget Act would have a negative effect on Vencor. As stated above, the defendants cannot be held liable for any statements about the Balanced Budget Act prior to its enactment. In addition, plaintiffs' allegations fail because they allege only motive and opportunity and do not establish a strong inference of recklessness. Because the plaintiffs have failed to establish that any of defendants' statement regarding either the acquisition of TheraTx or Transitional were false or misleading the plaintiffs have not stated a claim of fraud.

any of the statements made prior to August 5, 1997 were false or misleading when made, plaintiffs do not state a claim for fraud based on their allegations associated with the effect of the Balanced Budget Act on Vencor's earnings and revenues.

### 2. Acquisition of TheraTx and Transitional

Plaintiffs allege that the defendants made false and misleading statements about the effect that the acquisitions of TheraTx and Transitional would have on Vencor's earnings and revenues. In particular, plaintiffs allege that Vencor's statement on February 10, 1997, that the acquisition of TheraTx would be "accretive to earnings" was false and misleading. Plaintiffs state that defendants knew that TheraTx had $25 million in bad debt. Accepting that defendants knew of this debt, the plaintiffs' allegation does not state a claim. Plaintiffs do not allege how the existence of this bad debt makes Vencor's statement false and misleading. In addition, this statement is a prediction or opinion and constitutes "soft" information. As stated above, "soft" information statements are not actionable.

Plaintiffs also allege that defendants' statement on July 24, 1997, that Vencor had successfully integrated TheraTx's operations was false and misleading because TheraTx's computer system was not fully operational until March 1998. The plaintiffs' allegations state that the computer system was not implemented until all of the Vencor employees were trained to use it. Plaintiffs' allegations, however, fail to establish a strong inference that the defendants' statements were false and misleading when made. For this statement to constitute fraud, the plaintiffs would have to allege facts that demonstrate that the inability of Vencor to utilize TheraTx's computer system until all of its employees were trained in the new system prevented the integration of TheraTx's operations into Vencor, i.e. that this computer problem caused TheraTx's operations to be run separately from the rest of Vencor. The complaint lacks allegations connecting the computer system to the successful integration of the companies; thus, the

In *Briggs v. Ohio Elections Commission*, 61 F.3d 487, 493 (6th Cir. 1995) this court held that reversal is required if a plaintiff is not given notice and a reasonable opportunity to present evidence after the court has converted a motion to dismiss to a motion for summary judgment. The district court, in this case, gave no notice to the plaintiffs. In *Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 972 (6th Cir. 1989), this court held that "where a district court is contemplating entering sua sponte summary judgment against one of the parties, that party is entitled to unequivocal notice of the court's intentions." Because the plaintiffs did not receive "unequivocal notice" of the court's decision to convert the defendants' motion to dismiss into a summary judgment motion the district court abused its discretion. *See Salehpour v. University of Tennessee*, 159 F.3d 199, 203 (6th Cir. 1998) (holding that a court's decision to enter summary judgment *sua sponte* is reviewed for abuse of discretion). In addition, the district court abused its discretion when it did not provide the plaintiffs with a reasonable opportunity to present evidence to defend against a summary judgment motion.

Although this court finds that the district court was incorrect in converting this case without notice to the plaintiffs, we do not believe that we need to remand this case to allow the district court to correct this procedural error. "[A]n appellate court may affirm on any ground supported by the record, even though the ground relied upon by the lower court was different from the one chosen by the appellate panel." *Warda v. Commissioner*, 15 F.3d 533, 539 n.6 (6th Cir. 1994). We find that the dismissal of the complaint should be affirmed on the grounds that the plaintiffs have not pled sufficient facts to permit a strong inference that the defendants engaged in securities fraud.

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA") which heightened the pleading standard in securities litigation. Section 78u-4(b) states:

## (b) **Requirements for securities fraud actions**

### (1) **Misleading statements and omissions**

In any private action arising under this chapter in which the plaintiff alleges that the defendant —

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

### (2) **Required state of mind**

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. 78u-4(b)(1) & (2) (West 1997). This Circuit, in *In re Comshare, Inc. Securities Litigation*, 183 F.3d 542, 551 (6th Cir. 1999), interpreted this provision of the Act as requiring plaintiffs to allege facts that give rise to at least a strong inference of reckless behavior in order to satisfy the scienter requirement. The *Comshare* court held that allegations of fact "that illustrate nothing more than a defendant's motive and opportunity to commit fraud" do not satisfy the pleading requirements of the PSLRA. *Id*. We find that the plaintiffs' complaint does not allege sufficient facts to establish either (1) the falsity or the misleading characteristics of the defendants' statements or, (2) a strong inference that the defendants had the state of mind required by the statute.

memorandum[13] is included in the exhibits attached to the defendant's motion to dismiss and does not support the plaintiffs' allegations.[14]    Although the memorandum acknowledges that the legislation may have a negative impact on Vencor, it clearly states that no definite findings have been made and that further study is required before an accurate assessment of the effect of this legislation can be made. Even if plaintiffs' allegations are accepted as true and this court assumes that the defendants knew of this document, we do not believe the facts support a finding that the defendants knew that any statements about earnings and growth were false when made, nor that they were reckless. Because the plaintiffs do not allege any statements after August 5, 1997 that can be attributed to the defendants and plaintiffs do not allege sufficient facts to establish that the defendants knew

---

[13] Although this document is referenced in the plaintiffs' complaint, it could be argued that it has not been formally incorporated into the complaint. It still is appropriate for this court to consider this document and the others attached to the defendant's brief in support of their motion to dismiss. "When a document is referred to in the complaint and is central to the plaintiff's claim . . . the defendant may submit an authentic copy to the court to be considered on a motion to dismiss, and the court's consideration of the document does not require conversion of the motion to one for summary judgment." 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.30[4] (3d ed. 1998); *see also Greenberg*, 177 F.3d at 514 (citing this proposition with approval). Because the documents referred to in this opinion are "central" to the plaintiffs' claim this court may consider them in assessing the plaintiffs' pleadings on a motion to dismiss.

[14] Plaintiffs also allege that Vencor's financial department had undertaken numerous studies to discern the effect of the proposed legislation on Vencor during the months of April through July. Because the effect of proposed legislation can be considered a prediction or opinion the defendants had no duty to disclose these studies. In addition, if the court makes the assumption that the internal memorandum promulgated in late July would incorporate any other relevant studies, there is no allegation that permits a strong inference that any of these studies produced any "hard" information which should have been disclosed. Knowledge of the effects of the legislation cannot be imputed on the defendants. The memorandum does not contain any "hard" information, but rather, simply warns of the possibility of negative effects.

as certain as hard facts." *Id.* at 402 (quoting *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 241 (6th Cir. 1985)). Although the *Sofamor Danek* case precedes the adoption of the PSLRA, we believe that it is appropriate to apply its holding to this case. In *Comshare*, this Circuit held that "the PSLRA did not change the scienter that a plaintiff must prove to prevail in a securities fraud case but instead changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss." 183 F.3d at 548-49. The *Sofamor Danek* court's interpretation of the substantive law of scienter is not affected by the PSLRA's requirements for pleading; thus, its holding that "soft information" is not actionable continues to be the law of this Circuit. Because the enactment of the Balanced Budget Act was uncertain until August 5, 1997 defendants cannot be held responsible for not disclosing information about the possible effect that this legislation would have on Vencor's business. In addition, plaintiffs do not allege sufficient facts to permit a strong inference that any of the defendants had actual knowledge that the statements were false or misleading when made.

The plaintiffs also do not allege sufficient facts to demonstrate that Vencor made any false or misleading statements after the enactment of the Act. The pleadings set forth no statements, after August 5, 1997, which are directly attributable to any of the defendants. The alleged statements after the enactment of the Act are all statements made by financial analysts. The plaintiffs have failed to allege facts that demonstrate that the defendants took affirmative action allowing us to attribute these statements to the defendants. In addition, the plaintiffs have not alleged sufficient facts to demonstrate that the defendants knew these statements were false or misleading when made. Plaintiffs allege that the defendants received an internal memorandum in late July, after the bill had passed both houses, but prior to receiving the President's approval, informing them of the negative effect of the legislation on Vencor's earnings and revenues. This

The plaintiffs allege that the defendants made numerous false and misleading statements designed to inflate the price of Vencor stock. The plaintiffs contend that the defendants attempted to elevate Vencor's stock prices in order to ensure the success of Vencor's bond offering in July of 1997.[11] Plaintiffs also allege that the individual defendants benefitted from the elevated stock prices through sales of portions of their personal stock holdings. Plaintiffs allege that the individual defendants sold more than 222,000 shares of Vencor stock realizing proceeds of approximately $9.5 million. Each allegedly false or misleading statement made by the defendants concerned at least one of the following aspects of Vencor's business: (1) the effect of the Balanced Budget Act on Vencor's revenues and earnings; (2) the effect of the acquisition of TheraTx and Transitional on Vencor's revenues and earnings, (3) the proposed sale of BHC to Charter. The plaintiffs' remaining allegations relate to the sale of the individual defendants' stock holdings. We believe that the plaintiffs do not allege sufficient facts to demonstrate that any of the statements attributable to the defendants were false or misleading. In addition, we do not believe that the plaintiffs allege any facts to show that the defendants had the requisite state of mind. Because the plaintiffs' complaint does not allege sufficient facts to state a claim upon which relief can be granted, we affirm the dismissal of the plaintiffs' complaint.

Initially, it is necessary to determine which statements, contained in the complaint, can be attributed to the defendants. Plaintiffs allege numerous statements made by financial analysts which they contend are based on information provided to these analysts by one or more of the defendants. Relying on *In re Syntex Corp. Securities Litigation*, 95 F.3d 922, 934 (9th Cir. 1996) and *In re Time Warner Inc., Securities Litigation*, 9 F.3d 259, 265 (2d Cir.

---

[11]On or about July 15, 1997, Vencor announced a sale of $750 million of senior notes. The proceeds of this sale were used to replenish the credit facility which was depleted in connection with Vencor's $574 million acquisition of Transitional.

1993), defendants argue and the district court held that the financial analysts' statements cannot be imputed to the defendants unless the analyst's report directly attributes the statements to one or more of the defendants. In *In re Time Warner*, the Second Circuit held that Rule 9(b) requires a plaintiff to identify the speaker of allegedly fraudulent statements. *Id*. In reaching this conclusion, the court stated "[f]ew reporters or analysts would knowingly abet a fraud, and many will detect and reveal a corporation's efforts to use them as a channel for fraudulent statements. . . . Thus, the opportunity to manipulate stock prices through the planting of false stories is somewhat limited." *Id.* We believe that the Second Circuit is correct in its holding. Although a corporation provides analysts with information about the financial status of the corporation, the analyst does not simply repeat that information verbatim in his report. Instead, the analyst does what his job title suggests – he analyzes and synthesizes the information before reporting it to the public. We agree with the district court and the Second Circuit and hold that a corporation cannot be held responsible for analysts' statements about the corporation's financial health unless the corporation takes more affirmative action than simply providing information to the analysts. *See id.* Because the statements in the complaint by financial analysts do not satisfy the heightened pleading requirements this court will analyze the defendants' motion to dismiss based only on those statements in the complaint that can be directly attributed to one or more of the defendants.

### 1. Statements relating to the Balanced Budget Act

Plaintiffs allege that the defendants made numerous false and misleading statements about the effect of the Balanced Budget Act on the financial prospects of Vencor.[12]    In

---

[12]As stated above, many of plaintiffs' allegations of false and misleading statements cannot be attributed to the defendants. Of the remaining allegations, only defendants' statements in Vencor's press release announcing acquisition of TheraTx ( Compl. ¶ 32), announcement of Fourth Quarter 1996 results (Compl. ¶ 41), annual report (Compl.

assessing this aspect of the plaintiffs' complaint, there are two relevant time periods. The plaintiffs have alleged a Class Period of February 10, 1997 until October 21, 1997. Statements made by the defendants during the time period from February 10, 1997 until August 4, 1997 are not actionable because the defendants could not know whether the proposed legislation would be enacted. Although the plaintiffs could state a claim for statements made after the enactment of the legislation on August 5, 1997, the plaintiffs do not allege sufficient facts to demonstrate that the defendants made any statements after the enactment of the legislation that were false or misleading.

15 U.S.C. § 78u-5(c) establishes a safe harbor for forward-looking statements. Statements fall into this safe harbor if they are identified as forward-looking when made and are accompanied by cautionary statements. *See* 15 U.S.C. § 78u-5(c)(1)(A) (West 1997). Statements also are entitled to this protection if the plaintiff cannot prove that the speaker had actual knowledge that the statement was false or misleading when made. *See* 15 U.S.C. § 78u-5(c)(1)(B). All of the statements alleged by the plaintiffs relating to the effect of the Balanced Budget Act on the earnings and revenues of Vencor that occurred before the legislation was passed are entitled to this safe harbor protection. These statements contained "soft information" concerning potential earnings and projected growth. *See In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401 (6th Cir. 1997) (finding that "soft" information "includes predictions and matters of opinion"). This Circuit has held that "soft" information "must be disclosed only if . . . virtually

---

¶ 44), 1996 Form 10-K (Compl. ¶ 45), announcement of First Quarter results (Compl. ¶ 50), First Quarter 10-Q (Compl. ¶¶ 54-56), *Courier-Journal* article (Compl. ¶ 59), announcement of acquisition of Transitional Hospital Corporation (Compl. ¶ 65), Transitional presentation (Compl. ¶ 72), announcement of sale of notes (Compl. ¶ 76), announcement of Second Quarter results (Compl. ¶ 78), Second Quarter 10-Q (Compl. ¶ 83), announcement to sell network of hospitals (Compl. ¶ 89), and announcement of agreement to sell BHC (Compl. ¶ 92) should be considered in assessing plaintiffs' complaint. Of these statements only the last two occurred after the enactment of the Balanced Budget Act.