## In re ENVOY CORPORATION SECURITIES LITIGATION.

Nos. 3:98–0760, 3:98–0766, 3:98–0850.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 1, 2001.

Sheldon Albert, Jeffrey A. Barrack, Barrack, Rodos & Bacine, Philadelphia, PA, Richard H. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York City, George Edward Barrett, Johnston & Parsley, Nashville, TN, Stanley M. Chernau, Chernau, Chaffin & Burnsed, PLLC, Nashville, TN, for plaintiffs.

Bob F. Thompson, Bass, Berry & Sims, Nashville, TN, Robert Jackson Walker, John M. Tipps, John C. Hayworth, Walker, Bryant & Tipps, Nashville, TN, for defendants.

## MEMORANDUM

HAYNES, District Judge.

Plaintiffs, on behalf of themselves and all other persons similarly situated, filed this consolidated class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a) and Rule 10b–5 promulgated thereunder, 17 C .F.R. § 240.10b–5, against the defendants: Envoy Corporation ("Envoy" or the "Company"); Fred C. Goad, Jr., Envoy's chairman and co-chief executive officer, Kevin M. McNamara, Envoy's senior vice-president, chief financial officer and director; and Jim D. Kever, Envoy's executive vice president, secretary, general counsel and co-chief executive officer (hereinafter collectively referred to as the "Individual Defendants"). The Court has jurisdiction over this matter under 15 U.S.C. § 77(v) and 15 U.S.C. § 78aa.

Members of the proposed class are purchasers of Envoy's common stock during the period from February 12, 1997 to August 18, 1998, the "class period", who sustained damages as a result of those purchases. The Individual Defendants were or are senior executive officers and/or directors, shareholders, and controlling persons of Envoy during the proposed class period.

Plaintiffs' amended complaint asserts that during the class period, Envoy and the Individual Defendants drafted, approved, and/or disseminated materially false and misleading statements, reports and other public representations about Envoy's financial status and engaged in improper and unreasonable accounting practices that caused the price of Envoy's common stock to be artificially inflated. Plaintiffs allege, in particular, that Defendants improperly recorded large one-time write-offs to accounts for acquired in-process research and development ("IPR & D") in connection with Envoy's acquisition of three companies, none of which, Plaintiffs contend, had meaningful research and development expenditures. The plaintiffs

allege that the defendants acted knowingly or recklessly and that their accounting practices were unreasonable, unjustified and violated generally accepted accounting principles ("GAAP").[1]

Plaintiffs further allege that Defendants used at least 3.5 million shares of artificially inflated Envoy stock as consideration for the acquisition of a group of companies during the class period and that Individual Defendants Goad and Kever sought to profit from the artificial inflation of stock as shareholders.

In support of their allegations, Plaintiffs allege that on August 18, 1998, Envoy disclosed that the Securities Exchange Commission ("SEC") was investigating the Company's valuation and amortization of purchased research and development costs in connection with Envoy's acquisitions. Also, in November of that year, Envoy disclosed: (1) that it had decreased the amount of purchase price allocated to IPR & D for its 1996 acquisitions from $30 million to $8 million; (2) that its reported net loss for the fourth quarter of 1996 was understated by $2 million; (3) that its reported net losses for the first, second and fourth quarters of 1997 were understated by $82,000, $773,000 and $1,155,000 respectively and (4) that its reported net income for the first and second quarters of 1998 had been overstated by at least $2,184,000 and $2,172,000 respectively. After the August 18, 1998 disclosure, Envoy common stock fell from $35 per share to $22 per share. (Docket Entry No. 58 at p. 6).

Plaintiffs' claims are that Envoy's public statements about its financial results during the class period were materially false and misleading and that the defendants concealed materially adverse facts. The plaintiffs allege that the defendants' statements and accounting practices caused the plaintiffs to purchase Envoy common stock at an artificially inflated price, resulting in liability under Section 10(b) of the Securities Exchange Act and Rule 10b–5, which prohibits fraudulent, and material misrepresentations in the sale or purchase of a security. Plaintiffs further assert claims that each Individual Defendant is liable under Section 78(a), that provides for individual liability for "controlling persons" as defined by Section 20(a) of the Exchange Act.

In earlier proceedings, the Court granted Plaintiffs' motion to consolidate these cases and appoint Plaintiffs as lead plaintiffs. (Docket Entry No. 8, Exhibit A). In addition, Plaintiffs agreed upon their lead counsel. (*See* Docket Entry No. 14). On March 1, 1999, Defendants filed a motion to dismiss and for partial summary judgment. The Court heard oral arguments on the defendants' motion on August 30, 1999. (Docket Entry No. 38). On September 15, 1999, the Court simply granted the defendants' motion and Plaintiffs' complaint was dismissed without prejudice, but the Court's Order allowed Plaintiffs to reopen this action upon filing an amended complaint. (Docket Entry No. 41). On November 23, 1999 Plaintiffs filed an Amended Consolidated Class Action Complaint. (Docket Entry No. 43, Amended Consolidated Class Action Complaint (hereinafter amended complaint)). Shortly thereafter, the defendants filed a motion to strike the plaintiffs amended complaint. (Docket Entry No. 44). Due to the action being inadvertently closed, the Court[2] granted Plaintiffs' motion to administratively re-open this action (Docket Entry No. 52) and the action was reassigned to the undersigned who entered an Order denying the defendants' motion to strike the amended complaint and directing the defendants to file their motion to

---

1. "GAAP encompasses the conventions, rules and procedures that define accepted accounting practices at a particular point in time, and changes over time." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 1239, 131 L.Ed.2d 106 (1995).

2. The Honorable John T. Nixon, United States District Judge for the Middle District of Tennessee

dismiss within 30 days leaving Plaintiffs 30 days to respond. (Docket Entry No. 56). The Court heard oral arguments on the defendants' new motion to dismiss (Docket Entry No. 58) on August 21, 2000. (Docket Entry Nos. 69 and 70).

Before the Court is the defendants' motion to dismiss in which the defendants argue primarily: (1) that Plaintiffs have failed to allege specific facts giving rise to a strong inference of fraudulent intent of the part of the defendants under Fed. R.Civ.Pro. 9(b) and as required by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78u–4(b)(1) and (2) and (2) that Plaintiffs' action is barred by the statute of limitations which Defendants submit was not tolled by the dismissal of Plaintiffs' consolidated complaint and has now run on the claims in the amended complaint. (Docket Entry No. 58).

In response to the defendants' motion to dismiss, the plaintiffs assert that their amended complaint sets forth with particularity actionable claims under Section 10(b) and Rule 10b–5 of the Exchange Act against all defendants and also under Section 20(a) of the Act against the Individual Defendants. The plaintiffs also argue that the defendants' statute of limitations argument is without merit because Judge Nixon's Order dismissing the consolidated complaint was without prejudice and granted Plaintiffs leave to re-file their complaint under Fed.R.Civ.Pro. 15(c). Thus, Plaintiffs assert that their amended complaint is timely and relates back to the commencement of this litigation.

For the reasons set forth below, the Court concludes that the plaintiffs' claims are not time barred and that the plaintiffs have plead with adequate particularity Section 10(b) and Rule 10b–5 claims against Defendant Envoy and Individual Defendant McNamara. Plaintiffs have failed, however, to plead with particularity with respect to Section 10(b) and Rule 10b–5 claims against the Individual Defendants Goad and Kever; hence Section 20(a) "controlling persons" claims against

Defendants Goad and Kever lack merit. Plaintiffs have plead with adequate particularity Section 20(a) claims against Defendant McNamara. Thus, the defendants' motion to dismiss is granted in part, and denied in part.

## A. Statute of Limitations

Because the defendants' statute of limitations contention can dispose of this action and would have rendered consideration of the parties' other concerns moot, the Court addresses that issue first.

■ Under federal law, a statute of limitations in a federal securities case begins to run when "the fraud is or should have been discovered." *Freeman v. Laventhol* 34 F.3d 333, 341 (6th Cir.1994) (quoting *Herm v. Stafford,* 663 F.2d 669, 682 (6th Cir.1981)). The statutory standard is one year from discovery, but no more than three years from the alleged acts giving rise to the claim. *Ockerman v. May Zima & Co.,* 27 F.3d 1151, 1155 (6th Cir.1994) (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 362–64, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991)).

■ Here, the plaintiffs filed their original complaints on August 20, 1998, two (2) days after the defendants issued a press release announcing that the SEC was investigating the defendants' accounting practices and that the company would retain an "additional independent appraisal firm to conduct valuation procedures of intangible assets acquired by ENVOY". (Docket Entry No. 43, Amend.Consol. Class Action Compl. at ¶ 69). A Consolidated Complaint was filed on December 28, 1998. (Docket Entry Nos. 17).

On September 15, 1999, upon motion of the defendants (Docket Entry No. 23), Judge Nixon dismissed without prejudice the plaintiffs' Consolidated Complaint (Docket Entry No. 17). Judge Nixon's Order also states, in pertinent part:

"Plaintiffs' Complaint is hereby DISMISSED without prejudice. Should

they choose to do so, Plaintiffs may re-file their Complaint with this Court." (See Docket Entry No. 41). The Order did not state the grounds for the dismissal. The plaintiffs filed an Amended Consolidated Complaint on November 23, 1999. (Docket Entry No. 43).

Defendants argue that the language of Judge Nixon's Order dismissing the plaintiffs' consolidated complaint did not provide the plaintiffs with leave to amend their Complaint, but only provided them with the opportunity to initiate a new lawsuit. (Docket Entry 58 at p. 2). According to the defendants, the amended complaint does not relate back to the date of filing for the original consolidated complaint.[3] Thus, the defendants contend that the plaintiffs' action is time barred by the statute of limitations because the amended complaint is, in essence, a new civil action that was filed more that one year after the date the plaintiffs discovered or should have discovered the facts constituting the alleged securities violations.

In response, the plaintiffs argue that Judge Nixon's Order granted plaintiffs an opportunity to re-plead and directed the plaintiffs to re-file their complaint with "this Court" as opposed to any other court. (Docket Entry No. 62 p. 49 n. 50). Plaintiffs argue that the Order on its face was a clear indication that the Court had no intention of dismissing the action, but only the complaint. *Id.* at 49–51.

■ The Sixth Circuit has long recognized the difference between dismissal of a complaint and dismissal of an action. *See Azar v. Conley*, 480 F.2d 220, 223 (6th Cir.1973) ("There is a considerable body of [well-founded] case law distinguishing between a judgment which dismisses the action … and one that only dismisses the complaint without dismissing the action.") To find a dismissal without prejudice to be a final judgment, "[it] must be clear that the court determined that the action could not be saved by any amendment of the complaint which the plaintiff could reasonably be expected to make". *Id.* (quoting *Ruby v. Secretary of United States Navy*, 365 F.2d 385, 387 (9th Cir.1966)).

This Court concludes that the Judge Nixon's Order dismissed the complaint; not the action and granted the plaintiffs leave to amend their complaint. Accordingly, the Court concludes that the amended complaint relates back to the date filing of the original complaint. There no "special circumstances" here to permit this Court to find Judge Nixon's Order a final order dismissing the action. *Id.* Moreover, Judge Nixon issued an Order on January 18 granting plaintiffs' motion to administratively re-open this case. The Order stated in pertinent part:

> "Pursuant to the Court's Order of September 17, 1999, dismissing Plaintiffs' complaint without prejudice and granting them permission to re-file their complaint with this Court, the Court administratively re-opens the above-referenced matter." (citation omitted)

(Docket Entry No. 52). Thus, in accordance with Fed.R.Civ.P. 15(c) and Sixth Circuit precedents, the defendants' motion to dismiss on statute of limitations grounds is denied.

### B. Sufficiency of Complaint

#### 1. Analysis of Complaint

##### a. Defendants' Service Market

Envoy provides electronic data interchange and transaction processing services to participants in the healthcare market including pharmacies, physicians, hospitals, dentists, billing services, insurance companies, managed care organizations and government agencies. (Docket Entry Nos. 58 and 62). During the class period, Envoy was a publicly-held corporation with its common stock traded on the NASDAQ

---

3. An amendment of a pleading relates back to the date of the original pleading when … (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth … in the original pleading…. Fed.R.Civ.P. 15(c).

national market system and the Individual Defendants were senior executive officers and directors, major shareholders and controlling persons of Envoy. (*Id.;* Docket Entry No. 43, amended complaint at ¶ 16).

Envoy purchased National Electronic Information Corporation ("NEIC") in 1996 and Diverse Software Solutions ("DSS") and Healthcare Data Interchange Corporation ("HDIC") in 1997. *Id.* at ¶ 3. Plaintiffs allege that each of these companies, for the most part, were electronic processing and transmitting companies. *Id.*

In March 1996, Envoy acquired NEIC, a claims processing company of electronic health-care transactions, for a purchase price of $94.3 million. (Docket Entry No. 62 at p. 11). Of the $94.3 million, Envoy allocated $30 million dollars (32%) of the total purchase price to IPR & D. *Id.* The amount allocated to IPR & D was immediately written off in the first quarter of 1996, thus Envoy did not incur a periodic amortization expense in connection with this purchase.

In sum, Plaintiffs allege that Defendants violated 10(b), 20(a) and Rule 10b–5 through a continuous fraudulent scheme through their accounting practices. The alleged scheme centers on Envoy's acquisition of the three companies: NEIC, DSS and HDIC, and how the acquisition costs were recorded on Envoy's books and the effect that these acquisitions had on Envoy's financial statements. Plaintiffs allege that in "gross violation of GAAP", Envoy took excessive write-offs for IPR & D of the acquired companies in connection with Envoy's acquisitions. Plaintiffs allege that the scheme allowed Envoy to use its artificially inflated stock as consideration in the acquisition of other data processing companies. These write-offs allegedly inflated the trading price of Envoy common stock artificially. Plaintiffs further allege that Envoy knew or recklessly disregarded that "these astronomical write-offs to [IPR & D] were highly unreasonable and unjustified because they were based on sham valuations of IPR & D that were ... at

odds with reality." (Docket Entry No. 62, at p. 2). Plaintiffs allege that as a result of these write-offs, Defendants reported false and misleading statements regarding Envoy's financial results during the class period. *Id.*

As to the alleged acts of the Individual Defendants, plaintiffs assert that each Individual Defendant was involved in drafting, producing, reviewing, and/or disseminating materially false and misleading statements concerning Envoy's net income. (Docket Entry No. 43 at ¶ 17). Plaintiffs allege that the Individual Defendants knowingly or with reckless disregard approved, ratified, and/or failed to correct false and misleading statements regarding the Company. *Id.* According to Plaintiffs, the Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. *Id.* at ¶ 20. Plaintiffs allege that each Individual Defendants breached his duty to report all trends, demands, and uncertainties that were reasonably likely to affect (i) Envoy's net sales, revenues or income, or (ii) previously reported financial information such that would not be indicative of future operating results. *Id.* at ¶ 18.

### b. Envoy's Accounting Practices

In their amended complaint, Plaintiffs added as specific and material factual allegations for these claims the following:

59. At the time of the acquisition, NEIC was one of the largest processors and clearinghouses of electronic health-care transactions which transmitted more than 8 million claims monthly. Commenting on the acquisition, defendant Goad stated on March 6, 1996, in a Company press release: Envoy and NEIC form a progressive, new force in the processing of electronic transactions that will have significant administrative dollars for payers and providers alike

... Together, ENVOY–NEIC can demonstrate clear superiority in both traditional batch claims processing and real-time on-line, interactive transaction processing that is so critical to both traditional commercial carriers and today's emerging managed care organizations. NEIC is an excellent partner for ENVOY and fits the company's growth strategy ... The company will benefit from NEIC's connectivity to a significant number of hospitals, physicians, and dentists throughout the nation. The combined company creates a new, large-scale neutral claims and transactions processor to serve a variety of entities ...

60. Because NEIC was a processing company and not a research company, defendants knew or recklessly disregarded that writing off $30 million, or 32% of the purchase price to [IPR & D] was highly unreasonable and unjustified under GAAP and would result in inflated earnings in future periods. Indeed, by virtue of its due diligence at the time of the acquisition, ENVOY was aware that NEIC never had more than $1.5 million to $2 million invested in [IPR & D] and much of that research and development was, in fact, outsourced and effected by clients who had developed their own software systems.

\* \* \* \* \* \*

62. According to the Company's March 11, 1997 press release announcing the acquisition, DSS was a private company that provided automated electronic remittance advice posting, supplemental billing products and other software products and services to medical practices and services. Commenting on the acquisition, defendant Kever stated in the March 11 press that:

> We are extremely pleased to announce the acquisition of DSS. We believe that DSS's product and services offerings complement our existing physician and hospital segment business. This transaction fits well in

our strategy to pursue acquisitions of other healthcare information businesses that enhance and expand ENVOY's services. With the acquisition of DSS ... ENVOY is well positioned to offer our large provider and hospital customers a full range of electronic date interchange products and services.

63. As with NEIC, because DSS was not a company involved in any meaningful research and development and ENVOY was acquiring products that were fully developed, defendants knew or recklessly disregarded that the amount they attributed to [IPR & D] was highly unreasonable and unjustified under GAAP and would result in inflated earnings in future periods.

\* \* \* \* \* \*

65. HDIC, the processing subsidiary of Aetna/US Healthcare managed all electronic claims, referrals and eligibility verification between Aetna and its network physicians, dentists, and hospitals. Thus, HDIC was not a technology company engaged in researching and developing new products. In fact, ENVOY acquired HDIC for the specific purpose of handling the Company's electronic health-care transactions for its customers nationwide.

66. As with NEIC and DSS, because HDIC was a processing company, and not a company involved in research and development, defendants knew or recklessly disregarded that the amount ENVOY attributed to [IPR & D] was highly unreasonable and unjustified under GAAP and would inflate the company's reported earnings in future periods.

(Docket Entry No. 43, Amended Complaint, at ¶¶ 59, 60, 62, 63, 65 and 66).

The Accounting Principles Board ("APB") for GAAP, Opinion No. 16, provides that business combinations be accounted for by using one of two methods: (1) the "pooling-of-interest" method or (2) the "purchase" method. (Docket Entry

No. 43, amended complaint ¶ 54; *see also* Docket Entry No. 62 at p. 9). Here, Envoy used the purchase method, under which, a portion of the purchase price for the acquired company is allocated to each identifiable tangible or intangible assets and/or liabilities acquired, including IPR & D at their then current market value. (Docket Entry No. 43 at ¶ 54). The amount of any unassigned consideration is recorded as goodwill, an intangible asset, that must be amortized over a period of time against the future earnings of the entity. *Id.* However, unlike other purchased assets, IPR & D must be written off immediately in certain circumstances [4] and as a result, costs for IPR & D are not amortized against future earnings for future years.

Envoy acquired DSS for $4 million in cash, plus $3 million in anticipated contingent payments. (Docket Entry Nos. 58 at p. 18 and 62 at p. 12). In accounting for the DSS acquisition, Envoy wrote off $3 million (43%) of the purchase price to IPR & D in the first quarter of 1997. DSS was a private company that provided automated electronic remittance advice posting, supplemental billing products and other software products to medical practices and services. (Docket Entry No. 62 at p. 12).

In sum, these allegations reflect that in connection with its purchase of HDIC on August 7, 1997, Envoy paid $51.2 million cash and assumed liabilities. In accounting for the acquisition, Envoy wrote off $35 million (68%) of the total purchase price to IPR & D. (Docket Entry No. 62 at p. 13) This write-off occurred in the third

quarter of 1997. *Id.* at p. 13. Further, Plaintiffs argue that Defendants were aware and recklessly disregarded that NEIC never had more than $2 million invested in IPR & D at the time of the acquisition. *Id.* at ¶ 60. Plaintiffs also contend that because DSS had existing products and services in effect, any research and development associated with those products should have been recorded as assets; not written off. *Id.* at ¶ 63. In connection with the acquisitions, Plaintiffs also assert that Envoy should not have written off any of HDIC's IPR & D because HDIC was not involved in any meaningful research and development activity and its current products had future utility.[5] *Id.* at ¶ 66.

Plaintiffs assert that by taking these one-time write offs, Defendants violated GAAP and were able to understate the Envoy's reported net losses for the fourth quarter of 1996 and the first, second, and fourth quarters of 1997 and overstate its income for the first three quarters of 1998. (Docket Entry No. 43, amended complaint, at ¶ 4). Plaintiffs assert that this misleading reporting was a fraudulent scheme to inflate the price of Envoy common stock artificially and use shares of the artificially inflated stock as consideration for acquisition of a group of companies during the class period. *Id.* at ¶¶ 4–5.

### c. Envoy's Allegedly Materially False and Misleading Statements, Reports and Filings

Plaintiffs allege that on February 12, 1997, the beginning of the class period,

---

**4.** *See In re Animation Engineering Securities Litigation,* 110 F.Supp. 2d 1183, 1194 (S.D.Iowa 2000) (explaining SFAS No. 2 and FASB interpretation No. 4) that is discussed *infra* p. 23.

**5.** *See supra* note 4. *See also* (Docket Entry No 71, Attachment thereto, Current Accounting and Disclosure Issues, Purchased In–Process Research and Development, (Arthur Anderson SEC Practice/D*. SEC Staff Views) 2000) ("Applicability of FASB Statement No. 2 to Business Combinations …, distinguishes between 'assets resulting from research and de-

velopment activities' and 'assets to be used in research and development activities.' The amount of the purchase price allocated to 'assets to be used in R & D activities' must be expensed as IPR & D *unless* those assets have an alternative future use.") Envoy stated in its September 30, 1998 Form 10–Q that the intangible assets of NEIC, DSS and HDIC which were related to research and development that had not yet reached technological feasibility and for which there was not alternative future use were written-off to IPR & D. (Docket Entry No. 57, Exhibit D).

Envoy released its financial results for the fourth quarter and full year of 1996. *Id.* at ¶ 23. Envoy reported quarterly revenues of $25.2 million and losses of $362,000 before taxes which Plaintiffs allege was understated by approximately $2 million. Plaintiffs allege that this understatement was due to Defendants' accounting practices in connection to the NEIC acquisition. *Id.* at ¶ 24. Yearly revenues were reported as $76 .6 million with $37.3 million losses. *Id.* at ¶ 23. On March 27, 1997, Defendants filed a Form 10–K for the year ending December 31, 1996, signed by the Individual Defendants, repeating these financial results. *Id.* at ¶ 25.

According to the amended complaint, the Form 10–K represented that the financial results were the responsibility of the Envoy's management and were prepared in accordance to GAAP. *Id.* Plaintiffs' allege that both the February release and the Form 10–K were materially false and misleading and that Defendants' were aware and recklessly disregarded that the statements were not prepared in accordance with GAAP, *id.;* and that the revenues were materially overstated while losses were materially understated for the second, third and fourth quarters of 1996. *Id.*

Plaintiffs next point to an April 23, 1997 press release announcing Envoy's 1997 first quarter financial results. *Id.* at ¶ 27. These results marked revenues at $26.1.million and losses at $10.3 million before taxes. *Id.* The complaint alleges that the first quarter results included a $3 million write-off to IPR & D related to the March 1997 acquisition of DSS. Plaintiffs specifically allege that Defendant Goad stated:

> We continue to be encouraged by the strong, growth in all of our lines of business. For the fourth consecutive quarter, ENVOY had transaction growth of greater than 30%. We are particularly pleased that we have been able to maintain such strong operating results during a period of significant

integration activities. Now that the integration tasks are behind us, we are even more excited about the opportunities for continued growth in 1997 and beyond.

*Id.* at ¶ 17.

On May 12, 1997, Defendants filed Envoy's Form 10–Q for the first quarter with the SEC. The form was signed by Defendants Goad and McNamara and repeated the financial results previously reported during the April press release. Plaintiffs allege that the notes to the Consolidated Financial Statements contained in the first quarter 1997 10–Q falsely represented that:

> The . . . unaudited consolidated financial statements . . . have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10–Q and Article 10 of Regulation S–K . . . In the opinion of management, all adjustments consisting of normal recurring accruals considered necessary for a fair presentation have been included.

*Id.* at ¶ 28. Plaintiffs allege that the representations in the April press release and first quarter 1997 10–Q were materially false and misleading and that the net losses were actually $2,315,000, an understatement of at least $82,000. *Id.* at ¶ 29. According to Plaintiffs, the understatement was due to the defendants' violation of GAAP. Plaintiffs further allege that 10–Q was false because it incorrectly stated that the financial reports were prepared according to GAAP.

The alleged false statements and misleading information regarding Envoy's financial statements occurred for numerous quarters during the class period. The complaint alleges that in a July 23, 1997 press release and August 12, 1997 SEC Form 10–Q, Defendant released misleading financial results relating to the NEIC acquisition. Again, on October 22, 1997, Defendants issued a press release stating

that losses were due primarily to a one-time write-off of $35 million to IPR & D associated with Envoy's acquisition of HDIC. The complaint alleges that Defendants reported:

> The net loss for the third quarter ended September 30, 1997, results primarily from a one-time write-off of $35 million of acquired research and development costs associated with Envoy's acquisition of Aetna U.S. Healthcare's health care electronic data interchange subsidiary, Healthcare Data Interchange Corporation ("HDIC"), which closed on August 7, 1997.

*Id.* at ¶ 33. Moreover, Defendant Goad commented, "We are encouraged by our third quarter results, which demonstrate continued growth trends in our overall business." *Id.*

An SEC Form 10–Q filed on November 13, 1997 restated the financials reported in the October press release and falsely represented that the financial statements were prepared in accordance with GAAP and, "[A]ll adjustments consisting of normal recurring accruals considered necessary for fair presentation have been included." *Id.* at ¶ 34.

This reporting and filing routine occurred at the end of each quarter and continued throughout the class period. Then on February 23, 1998, Envoy announced that it would acquire three additional companies: (1) XpiData, (2) Professional Office Services and (3) Automated Revenue Management, Inc. (collectively referred to as the "Expressbill Companies") for $3.5 million shares of Envoy common stock. *Id.* at ¶ 38. Plaintiffs allege that the artificially inflated stock price of $46 per share that resulted from the Defendants' improper accounting practices associated with the NEIC, DSS and HDIC acquisitions enabled Envoy to acquire the Expressbill. *Id.*

Envoy reported its 1997 fiscal year financial results on March 6, 1998 when Defendants filed the 1997 Form 10–K. Again, Plaintiffs allege that these results were false and misleading and that contrary to Defendants representations, the financial statements were not prepared in accordance with GAAP. *Id.* at ¶¶ 38–41. In April, 1998 Defendants disseminated an Annual Report to Envoy shareholders which included a copy of the Company's 1997 10–K. The 1997 Report contained a letter to shareholders from Defendants Goad and Kever which stated:

> 1997 was a very successful year for Envoy. We secured a number of major strategic relationships with health care industry participants, on both the payer and provider sides, and launched some exciting real-time connectivity programs which significantly enhanced our position as a leader in the health care electronic data interchange (EDI) industry. In the midst of all this activity, we met or exceeded all of our financial goals..

*Id.* at ¶ 41.

In May, 1998, Plaintiffs allege that Defendants knowingly and recklessly continued this pattern of quarterly press releases and securities filings which overstated income and understated losses. *Id.* at ¶ 45. Plaintiffs assert that Defendants overstated net income at least 30 times and that such overstatements were due to the big write-offs to IPR & D associated with the NEIC, DSS and HDIC acquisitions. *Id.; see also* ¶¶ 46–51.

Plaintiffs' amended complaint alleges that these acts constitute a fraud on the market that continued until Defendants' August 18, 1998 press release announcing the SEC investigation. *Id.* ¶ 48. Finally, Plaintiffs assert that the Safe Harbor doctrine is inapplicable in Defendants' case because the defendants' statements were not identified as "forward-looking statements" when made. *Id.* at ¶ 83.

#### d. Alleged Acts of the *Individual Defendants*

Plaintiffs allege that Defendant Goad served as Envoy's Chairman, co-chief executive officer and director, during the class period and signed each of Envoy's 10–Q's

and 10–K's filed by the Company. *Id.* at ¶ 16(a). Plaintiffs allege that defendant Goad engaged in a fraudulent scheme to profit from the artificial inflation of the Company's stock as an individual shareholder. *Id.* at ¶ 3. Plaintiffs also allege that Goad owned at least 681,723 shares of Envoy common stock (approximately 3.2% of all then outstanding shares) and attempted to profit through the public offering 100,000 of his shares at an alleged artificially inflated price of $43 per share *Id.* at ¶ 46. According to Plaintiffs, Defendant Goad abandoned this attempt only after it was publicly revealed that the SEC was investigating the Company's accounting practices. *Id.* at ¶ 5.

Defendant Kever, Envoy's president and co-chief executive officer, owned at least 710,526 shares of Envoy common stock (approximately 3.3% of all then outstanding shares). *Id.* at ¶ 16(b). Plaintiffs' allege that Defendant Kever signed each of the 10–K's filed by the Company during the class period. *Id.* Plaintiffs' also allege that Kever participated in a scheme to sell 100,000 shares of his artificially inflated common stock to the public for a profit. (*Id.* at ¶¶ 5, 46).

Plaintiffs even allege that the Registration statements filed on March 12, 1998, by Defendants Goad and Kever to sell their shares of stock and signed by each Individual Defendant was false and misleading because it misstated the Envoy's net losses for the first quarters of 1997 and 1998.

Plaintiffs allege that Defendant McNamara, the Envoy's senior vice-president, chief financial officer and director owned at least 30,331 shares of Envoy common stock. Defendant McNamara signed each of the 10–Q's and 10–K's filed by the Envoy during the class period. *Id.* at ¶ 16(c). Defendant McNamara was listed as Envoy's "contact person" for investors in each of the press releases addressing Envoy's financial status. *Id.*

Plaintiffs further allege that each of the Individual Defendants directly or indirectly controlled the conduct of Envoy's business; made affirmative statements to securities analysts and the investing public at large; and participated in meetings and discussions concerning their statements. *Id.* at ¶ 20.

### 2. Conclusions of Law

On consideration of a motion to dismiss, the Court must determine whether there are any circumstances in which the plaintiffs can state a claim for relief, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) under a notice pleading standard pursuant to Fed.R.Civ.P. 8. The complaint is to be "construed favorably to the pleader." *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. To evaluate the legal sufficiency of a complaint, the Sixth Circuit observed that "our standard of review requires more than bare essentials of legal conclusions". *Columbia Natural Res., Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995). "[W]e need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

Moreover, where, as here, fraud is alleged, Fed.R.Civ.P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The Court of Appeals has ruled that the provisions of Fed.R.Civ.P. 8 and the requirement of Rule 9(b) are to be read in conjunction with each other. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). In *Blount Fin. Serv. v. Walter E. Heller & Co.,* 819 F.2d 151, 153 (6th Cir.1987), the Court explained that "Rule 9(b) requiring 'averments of fraud ... with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." Rule 9(b) is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive

pleading." *American Town Ctr. v. Hall 83 Assoc.*, 912 F.2d at 104, 109 (6th Cir.1990).

■ Under *Ameritrust*, the plaintiff can satisfy the requirements of Rule 9(b) by pleading the circumstances of the fraud, not the evidence. 848 F.2d at 690 n. 9. Since *Ameritrust*, however, the Court of Appeals reiterated that the rule of this Circuit is that "... FRCP 9(b) requires that fraud be pleaded with particularity. *To satisfy FRCP 9(b), a plaintiff must at a minimum allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied." American Town Ctr.*, 912 F.2d at 109 (quoting *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir.1984)) (emphasis added).

■ In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient under Rule 9(b).

> The defendants now before the Court comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt to distinguish among them. This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is accused, especially in a case involving multiple defendants. *Brew v. Philips, Appel & Walden, Inc.*, CCH Fed.Sec.L.Rep. 97,-697 (S.D.N.Y.1980); *Goldberg v. Meridor*, 81 F.R.D. 105 (S.D.N.Y.1979). 'The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the "defendants," for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.' *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 639 (N.D.Cal. 1980), *quoting Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518 (S.D.N.Y.1977).

*Benoay v. Decker, 517 F.Supp.* 490, 493 (E.D.Mich.1981), *aff'd* 735 F.2d 1363 (6th Cir.1984).

The PSLRA heightened the pleading standard in securities litigation. *Helwig v. Vencor, Inc.*, 210 F.3d 612, 619 (6th Cir. 2000). Section 78u–4(b) of the PSLRA states:

> (b) Requirements for securities fraud actions:
>
> (1) Misleading statements and omissions
>
> In any private action arising under this chapter in which the plaintiff alleges that the defendant—
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstance in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation is based on information and belief, state with particularity all facts on which that belief is formed.
>
> (2) Required state of mind
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(1) & (2) (1998). If the plaintiffs do not meet this requirement, a court may, on any defendant's motion, dismiss the complaint. *See* 15 U.S.C. § 78u–4(b)(3) (1998).

■ To state a claim under Section 10(b) and Rule 10b–5, plaintiffs must allege "in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff[s] justifi-

ably relied and which proximately caused the plaintiff[s'] injury." *In re Comshare,* 183 F.3d 542, 548 (6th Cir.1999) (citing *Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1409 (6th Cir.1991)). Plaintiffs can also state a claim "by alleging facts that give rise to a strong inference of reckless behavior." *Id.* At issue is whether the alleged facts in the consolidated amended complaint meet the pleading requirements for scienter.

"[T]he Supreme Court has defined 'scienter' as a 'mental state embracing intent to deceive, manipulate or defraud.'" *In re Comshare, Inc. Securities Litigation,* 183 F.3d 542, 548 (6th Cir.1999) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). The PSLRA requires that the complaint in a securities action state with particularity facts giving rise to a strong inference that the defendants acted with scienter. 15 U.S.C. § 78u–4(b). "Under current Sixth Circuit law, 'recklessness [also] satisfies the § 10(b)/Rule 10b–5 scienter requirement.'" *Id.* (citing *Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1024 (6th Cir.1979)). Recklessness, however, as applied to securities fraud claims, is more stringent than that applied as a form of negligence. *Id.* at 549. If the complaint fails to satisfy the scienter requirement, the Court must dismiss the plaintiffs complaint upon a motion of the defendant. 15 U.S.C. § 78u–4(b)(3).

#### a. Plaintiffs' claims against Envoy

Plaintiffs' scienter allegations focus on defendants' large write offs to IPR & D for Envoy's acquisitions of NEIC, DSS and HDIC companies and assert that the use of these large write offs violate GAAP and are thereby suspect. Moreover, the plaintiffs allege that these write offs were part of a scheme by Envoy to make future acquisitions; specifically the Expressbill companies. Under Plaintiffs' reasoning, the size of these write-offs raises a strong inference of scienter because they reflect the Defendants' knowing or reckless use of such accounting practices that overstated

Envoy's income and understated its losses resulting in an artificial inflation of the value Envoy's stock.

■ The Sixth Circuit has held that "the failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *Comshare,* 183 F.3d 542, 553; and that "the bare pleading of motive and opportunity does not, standing alone, constitute the pleading of a strong inference of scienter" *Id.* at 551. Yet "... GAAP violations ... along with other circumstances, can create a strong inference of scienter." *In re Engineering Animation Securities Litigation,* 110 F.Supp.2d at 1196.

Initially, the Court takes note that the allocation of IPR & D is not an uncommon accounting practice by many companies. As the District Court in *Engineering Animation* observed:

> "Under GAAP ... when a company acquires another company and acquires research and development value from that company, that value should be capitalized an amortized as an intangible asset if the research and development project has alternative future uses. Alternatively, if the IPR & D portion of the acquisition is purchased for a particular research and development project and otherwise has not separate economic value, then that amount can be expensed as a cost at the time the cost is incurred."

*Id.* at 1194–95 (explaining SFAS No. 2 and FASB interpretations No. 4).

Yet, in an October 1998 letter to the AICPA from the SEC's Chief Accountant, the Chief Accountant warned that:

> "IPR & D was being used often in business combination purchases to disguise the acquisition of assets. Further the letter stated that acquiring companies would have to restate their financial statements and also inform the public of 'material assumptions underlying the purchase price allocation.'"

*Id.* (citing letter from SEC Chief Accountant to the AICPA 10/98); *see also* (Docket

Entry No. 71, attachment thereto, Carol J. Loomis, *The Crackdown Is Here*, FORTUNE, August 2, 1999 at 84, 88). Moreover, as the Court in *Engineering Animation* stated, "the fact that many companies were doing the same thing, however, does not excuse a fraudulent practice." *Id.* at 1195.

In *Engineering Animation* the Court considered securities claims involving IPR & D write-offs in the following factual context:

> In November, 1997, the defendant acquired a company entitled Rosetta and paid for the acquisition in two separate transactions by exchanging shares of its own outstanding common stock for shares of the acquired company's common stock. In the second transaction to acquire Rosetta, the defendant acquired approximately $7.1 million worth of Rosetta common stock or 32% of the total value of Rosetta common stock Of this amount, EAI allocated $5.6 million ... IPR & D.
>
> In June, 1998, the defendant acquired a second company which was entitled Sense8. This acquisition cost the defendant $7 million of its own stock. Sense8 was a company in financial distress, as its liabilities exceeded its assets by approximately $2.4 million. Therefore, the total acquisition cost for the defendant was $9.4 million. The defendant recorded this acquisition as a purchase of $500,000 of goodwill and $9.8 million of IPR & D.
>
> Plaintiffs argued that by allocating significant portions of the purchase price of both Rosetta and Senses to IPR & D, EAI was able to boost its future earnings. Further, Plaintiffs argue this was improper as contemplated by the standards set by generally accepted accounting principles ("GAAP")....

＊　　＊　　＊　　＊　　＊　　＊

On March 4, 1999, the defendant filed with the SEC amended 1997 10–K forms, and amended 10–Q forms for the first three quarters of 1998. These amended filings followed a statement by the Company's representative on February 18, 1999 in a press release that the company's IPR & D calculations in connection with Rosetta and Sense8 acquisitions would be amended, and that these amendments would 'have no impact on the Company's cash flows for any prior or future period.' Ultimately, in the amendments EAI changed its original allocation of $5,599,000 to IPR & D from the Rosetta acquisition to$1,684,000, a 70% reduction; and also the IPR & D allocation for the acquisition of Sense8 changed from $9,800,000 to $1,900,000, an 81% reduction. The stock price did not drop immediately following the accounting change or the accounting of it.

*Id.* at 1195.

The court in *Engineering Animation* concluded that the size of the amount that had to be reallocated to Engineering Animation's IPR & D "supports a contention that this was not just a marginal judgment call." *Id.* at 1195. Further, the Court concluded that "[T]he magnitude of Defendants' reporting decisions was so large that Defendants' IPR & D allocation accounting, and relating statements could be shown to be fraudulent." *Id.* (finding that the magnitude of the re-allocated IPR & D, 70% and 81%, is appropriate to consider when determining whether to dismiss a securities fraud claim). In other securities actions involving accounting write-offs of inventory, in contrast to IPR & D, as here, the Second Circuit has found that factual allegations of significant write-offs that devalue a corporation's stock can sufficiently allege scienter. *Rothman v. Gregor*, 2000 Westlaw 1026348 at *9–10 (2d Cir.2000); *Novak v. Kasaks*, 216 F.3d 300, 312–13 (2d Cir.2000).

██ As applied here, Envoy reduced the original amounts that it had allocated to IPR & D by 73%, 80% and 83%, for each of its acquisitions (Docket Entry No. 43, at ¶ 67). The NEIC amount allocated to IPR & D dropped from $30 million to $8 million, $3 million to $600,000 for the DSS

acquisition and $35 million to $6 million for the HDIC acquisition. *Id.* Applying *Engineering Animation*, the Court concludes that the size of the re-allocation of Envoy's IPR & D write-offs provides adequate predicates to satisfy the pleading requirement for the scienter element of Plaintiffs' securities claims.

Defendants argue that Plaintiffs' allegations of improper accounting "to boost the Company's operating results" (Docket Entry No. 58 at p. 25) are illogical because while it is true that Envoy restated its year-end financial results for 1996 and 1997 and its financial results for the first three quarters of 1998, Defendants' restatements resulted in a reduction in losses for 1996, 1997 and the first three quarters of 1998. Defendants also argue that Plaintiffs' allegations are illogical because the amount of costs allocated to IPR & D for each individual acquisition is minute in comparison to the total purchase price.

■ The Supreme Court has held that a misleading statement or omission is material if a reasonable investor would have viewed the statement or omission "as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). The Court recognizes that there is some authority for the proposition that a misstatement or omission that concerns only a small fraction of the company's revenues or assets is immaterial as a matter of law. *See, e.g., In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1427 (3d Cir.1997) (changes that increased defendants' costs by 0.2% during the relevant period immaterial as a matter of law); *Glassman v. Computervision Corp.*, 90 F.3d 617, 633 (1st Cir.1996) (alleged non-disclosure of a change of a few percent of backlog levels immaterial as a matter of law). The Sixth Circuit, however-

er, has never so held. The Court notes, moreover, that in general, the issue of materiality presents a mixed question of law and fact; therefore, "the district court should decide the issue of materiality as a matter of law only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question." *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir.2000) (citations omitted).

Here, the Plaintiffs' allege that the Defendants' alleged failure to follow GAAP was done intentionally in order to inflate Defendant's stock as a means to purchase a series of companies. This Circuit defined recklessness in *Mansbach*, as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care ... [and] so obvious that any reasonable man would have known of it". 598 F.2d at 1025.

■ Plaintiffs' allegations that Envoy purchased three processing companies, each of which allegedly had little research and development expenditures because each company had existing useful products and services at the time of its purchase. The classification of these written offs meets the recklessness requirement. The SEC's reduction of defendants acquisitional write-offs at percentages of 73%, 80% and 83% gives rise to a strong inference of recklessness. In sum, a failure to follow GAAP, coupled with the size of these write offs and the SEC's reduction of these write-offs,[6] leads the Court to conclude that a reasonable person could infer the requisite recklessness by the defendants.

Defendants assert that Plaintiffs have failed to support allegations that NEIC, DSS and HDIC are data processing companies with insignificant research and development costs and that Defendants therefore acted knowingly or recklessly in

---

**6.** The mere fact of a restatement of material accounting errors alone is insufficient to infer an intent to deceive investors. *Alabaster v. Bastiaens* Civil Action No. 99–10237 (D.Mass Memorandum filed July 27, 2000 at p. 17); *In re Peritus Software Services, Inc.* 52 F.Supp.2d 211, 223 (D.Mass.1999). A restatement required by the SEC, however, is probative. *Alabaster*, at pp. 17–18.

its accounting practices. (Docket Entry No. 62 at p. 13). The Court finds this argument without force for reasons stated above. Moreover, "[o]n a motion to dismiss, [the] Court must accept plaintiffs allegations as true." *Helwig,* 210 F.3d 612, 612 n. 1 (6th Cir.2000); *see also Comshare,* 183 F.3d at 547. "Dismissal of a complaint is not proper 'unless it appears beyond doubt that [Plaintiffs] can prove no set of facts in. support of his claim which would entitle [it] to relief.'" *Comshare,* 183 F.3d at 547 (citing *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). This Court does not find such a situation here.

Defendants, then argue, that Plaintiffs' allegations of fraudulent intent defy reason when examined closely because Envoy's acquisition of NEIC, DSS and HDIC were paid for with cash and assumed liabilities, not stock. This argument lacks force because the write-offs to IPR & D for these specific acquisitions are what Plaintiffs allege enabled Envoy to purchase the Expressbill companies that were undisputedly paid for with Envoy common stock. (Docket Entry No. 58).

### b. Plaintiffs' claims against the Individual Defendants

As to Section 10(b) and Rule(b) claims against the Individual Defendants, Plaintiffs' have presented no proof, other than their positions, that the Individual Defendants acted either knowingly or recklessly during the class period with respect to Envoy's financial results.

For these claims, Plaintiffs allege that the Individual Defendants had communications and contacts with other corporate officers and employees, attended meeting of Envoy's Board of Directors and committees thereof and were provided with periodic reports about Envoy. (Docket Entry No. 43 ¶ 21). As to each Individual Defendant, Plaintiffs allege that he reviewed and/or signed each of Envoy's 10–K and 10–Q forms. Plaintiffs also allege that the Individual Defendants made affirmative statements to securities analysts and the investing public at large and at meetings concerning such statements. *Id.* at ¶ 20. In addition, Plaintiffs' allege that Defendant Envoy named Defendant McNamara as their "contact person" in press releases concerning Envoy's financial. *Id.* at ¶ 16(c).

Plaintiffs' specific allegations attributing to the knowledge or reckless disregard of the Individual Defendants concern allegations of Defendant Goad and Kever's stock sales. However, these factual allegations are insufficient to show "active participation". The "[s]ale of stock ... create[s] a 'strong inference' of scienter only if the sales are 'unusual' or 'suspicious'". *See Acito v. IMCERA Group, Inc.,* 47 F.3d 47 (2d Cir.1995) (holding that mere allegations of stock sales by outside director do not give rise to "strong inference" of scienter. Accord *In re Apple Computer Securities Lit.,* 886 F.2d 1109, 1117–18 (9th Cir.1989) (noting that mere sale of stock by insiders does not create inference of scienter). Here, Plaintiffs do not point to anything to show that the Individual Defendants' sales were unusual in timing or quantity. At best, Plaintiffs' allegations may establish motive and opportunity, but motive and opportunity are "insufficient to demonstrate a strong inference of the Individual Defendants use of inside information deceptively." *Helwig,* 210 F.3d at 624. Moreover, Defendant McNamara did not attempt to sell any stock and the sales by Goad and Kever were not completed. These facts tend to negate any inference of ill motive of directors. *See In re Burlington Coat Factory Litig.,* 114 F.3d 1410, 1423 (3d Cir.1997) (holding no inference of scienter where two of five defendants did not make any sale)). Thus, this Court concludes that Plaintiffs have failed to allege particularized facts regarding the Individual Defendants Goad and Kever to withstand a motion to dismiss Plaintiffs' 10(b) claims.

Plaintiffs have, however, raised a strong inference of scienter as to Defen-

**664**

dant McNamara. Defendant McNamara was the chief financial officer during the class period making him the supervisor over all financial departments. Furthermore, it is undisputed that Envoy held Defendant McNamara out as the "contact person" regarding Envoy's financial condition on Envoy's press releases. *See* (Docket Entry No. 57, Attachment thereto, Exhibits A, B and C). Withe the conclusions on Plaintiffs' claims against Envoy, the Court concludes that such allegations are sufficient to establish the required elements for a § 10(b) claim against Defendant McNamara.

Plaintiffs further allege that the Individual Defendants are jointly and severally liable as "controlling persons" of Envoy under Section 20(a) of the Act. The plaintiffs allege that Defendants Goad, Kever, and McNamara made misleading statements and representations regarding Envoy's financial situation. Plaintiffs allege that each of the Individual Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the company at the highest levels and were privy to confidential proprietary information concerning the Company. (Docket Entry No. 43 at ¶ 17).

▮ Section 20(a) of the 1934 Act imposes legal responsibilities upon the "controlling person" in a company for Rule 10b–5 violations. In the Sixth Circuit, if the predicate 10b–5 claims lack merit, then the controlling persons claims under Section 20(a) fail. *See Stavroff v. Meyo*, 1997 WL 720475, at * 7 n. 5 (6th Cir. Nov.12 1997).

As to the merits of plaintiffs' Section 20(a) claim against the Individual Defendants, Section 20(a) of the 1934 Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to

any person to whom such control person is liable *unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.*

15 U.S.C. § 78t(a) (emphasis added).

▮ The "controlling person" theory is statutory in nature and is separate from any common law theory of liability. To impose securities liability upon a "controlling person", this Circuit observed that: "A director of a corporation is not automatically liable as a controlling person. There must be some showing of actual participation in the corporation's operation or some influence or awareness of the unlawful activity before the consequences of control may be imposed." *Herm v. Stafford,* 663 F.2d 669, 686 (6th Cir.1981). As to controlling persons, in this Circuit, a failure to investigate cannot serve as a basis for a corporate director's liability. *Id.* at 684. Further, this Circuit has dismissed a Section 20 claim against a corporate president, chief executive officer, and chief operating officer where there were no factual allegations that the named defendants had "the practical ability to direct the actions of the people" who committed the violations. *Stavroff,* 1997 WL 720475 *7 at n. 5 (quoting *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 949 (7th Cir.1989)).

Accordingly, this Court finds that Section 20(a) claims against Defendants Goad and Kever fail, but, the factual allegations against Defendant McNamara are sufficient to show "active participation" as well as his practical ability to direct the actions of others for a Section 20(a) claim.

*Conclusion*

For the above reasons, Defendant's motion to dismiss is granted in part and denied in part. Defendants' motion is granted as to Plaintiffs' Section 10(b) and Rule 10b–5 claims against the Individual Defendants Goad and Kever for failure to plead facts that would raise a strong infer-

ence of scienter. The defendants' motion to dismiss is also granted on Plaintiffs' Section 20(a) claims against Defendants Goad and Kever. Defendants' motion is denied on Plaintiffs' Section 10(b) and Rule 10b–5 claims against Defendants Envoy and McNamara. Defendants' motion is also denied as to Plaintiffs Section 20(a) claims against Individual Defendant McNamara for "controlling persons" liability.

An appropriate Order is entered herewith.